Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/25/2019 09:07 AM CDT

State of Nebraska, appellee, v.
Jeffery S. Smith, Appellant.
___ N.W.2d ___

Filed February 1, 2019.    No. S-18-178.

1. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.
2. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.
3. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
4. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
5. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

6. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

7. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

8. **Constitutional Law: Criminal Law: Trial: Witnesses.** While the Confrontation Clause guarantees a criminal defendant a face-to-face meeting with witnesses appearing before the trier of fact, that guarantee is not an absolute right. But while the face-to-face requirement is not absolute, it cannot be disposed of easily.

9. **Constitutional Law: Trial: Witnesses: Public Policy.** A defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

10. **Constitutional Law: Trial: Witnesses: Appeal and Error.** An unconstitutional denial of face-to-face confrontation, like other types of violations of the Confrontation Clause, is subject to harmless error review.

11. **Constitutional Law: Trial: Proof: Appeal and Error.** Where the trial error is of a constitutional dimension, the burden must be on the beneficiary of the error to prove beyond a reasonable doubt that the error did not contribute to the verdict obtained.

12. **Verdicts: Juries: Appeal and Error.** Harmless error review ultimately looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

13. **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

14. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

15. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

16. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

17. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

18. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Harlan County: Terri S. Harder, Judge. Affirmed.

D. Brandon Brinegar, of Ross, Schroeder & George, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Jeffery S. Smith appeals his convictions and sentences for first degree sexual assault of a child and felony child abuse following a bench trial in the district court for Harlan County. Smith claims that the court violated his constitutional right of confrontation when it allowed the alleged victim to testify outside Smith's presence. Smith also makes claims of ineffective assistance of trial counsel, insufficiency of the

evidence, and excessive sentences. We affirm Smith's convictions and sentences.

## STATEMENT OF FACTS

Smith lived in Alma, Nebraska, with his wife, Rochelle Smith, their two children, and Rochelle's two children from a prior relationship. The State originally charged Smith with four counts of first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01(1)(b) (Reissue 2016) and four counts of felony child abuse in violation of Neb. Rev. Stat. § 28-707(1)(a) or (e) and (4) (Reissue 2016). The State amended the information to charge one count of each offense. The alleged victim with respect to each charge was R.F., who is Rochelle's daughter from a prior relationship and who was born in February 2001. Smith was born in January 1978. The offenses were charged as having been committed between August 1 and September 30, 2016, when R.F. was 15 years old. Smith's trial on the charges was held in October 2017, when R.F. was 16 years old.

In October 2016, police investigated suspected sexual abuse of R.F. by Ronald Lauhead, an adult friend of Smith and Rochelle. The investigation began after Smith reported to police that one of the other children had told him that she had seen Lauhead naked with R.F. The investigation led police to suspect that Smith and Rochelle had also been involved in the abuse of R.F., and eventually Smith, Rochelle, and Lauhead were each charged with offenses related to such abuse.

Smith waived his right to a jury trial, and the district court scheduled a bench trial for October 24, 2017. The State called Rochelle as its first witness. Rochelle's testimony was as follows.

At the time of the trial, Rochelle was divorced from Smith. She had married Smith in 2007, and they had been married for over 10 years prior to the divorce. Rochelle has four children—two older children from a prior relationship and two younger children with Smith. R.F. is the oldest of Rochelle's children. In 2013, Rochelle and Smith and the four children

moved into a house in Alma. Soon thereafter, Rochelle introduced Smith to Lauhead, whom she had known from high school. Smith and Lauhead became friends, and Lauhead frequently spent time at Smith and Rochelle's house. One night in March 2016, when the children were asleep in their beds, Smith invited Lauhead to engage in a sexual encounter with Smith and Rochelle. Rochelle testified that she initially objected, but she eventually gave in and the three engaged in sexual activities in Smith and Rochelle's bedroom. The next day, Rochelle told Smith that she was not comfortable with what they had done with Lauhead. However, Smith convinced Rochelle to engage in sexual encounters with Lauhead "[t]wo or three more times" in April.

The last time that Rochelle recalled engaging in group sexual activity with Smith and Lauhead was at the end of September 2016. Rochelle finished working at 11 p.m., and when she returned home, Smith and Lauhead were watching television in the living room. The children were asleep in their rooms. Eventually, Smith "suggested another threesome" and Rochelle "went along with" the suggestion. The three went to Smith and Rochelle's bedroom and removed their clothing. Smith and Rochelle lay on their bed touching one another, while Lauhead performed oral sex on Rochelle.

At some point, Smith got out of bed, put on his boxer shorts and left the bedroom. Shortly thereafter, Smith returned to the bedroom with R.F., who was wearing sweatpants and a T-shirt. Smith said that R.F. "was going to join in on the activity." Rochelle told him "no, it wasn't going to happen," but Smith threatened that "if it didn't happen he was going to take all the kids and leave [the] state and [Rochelle would] never see them again." Smith then proceeded to undress R.F. and touch her breasts with his hands as they were standing beside the bed. After Smith had taken all of R.F.'s clothes off, he had her lie down on the bed and then he lay on the bed with R.F. and Rochelle. Lauhead, who had been performing oral sex on Rochelle, moved to the other side of the bed beside

R.F. Lauhead and Smith were both touching R.F.'s breasts and vagina.

In response to the State's question regarding how Smith was touching R.F.'s vagina, Rochelle testified, "Just putting his hand on it and rubbing it." The State further inquired regarding Smith's touching R.F.'s vagina by asking, "[D]id you see him put his finger inside of her vagina?" Rochelle responded, "No." The State asked, "What did you see him do?" Rochelle responded, "He was just fondling the top of it." When the State asked Rochelle to describe what she meant by "fondling," Rochelle stated, "Rubbing it." The State returned to the topic in its redirect examination of Rochelle. The State asked Rochelle to describe Smith's touching of R.F.'s vagina in "better detail." Rochelle replied that "[h]e was touching the outward part of her vagina." The State asked, "Was that between the skin folds known as the labia?" Rochelle replied, "Yes." Upon further questioning, Rochelle testified that Smith had touched R.F. "between the lips of her vagina" for "[m]aybe three to five seconds" and that she had seen him do so "[j]ust once." The State also asked, "But you did not see him actually insert his finger into her vaginal opening?" Rochelle replied, "No, ma'am."

Rochelle testified on direct examination that during the encounter among the four, Lauhead had vaginal intercourse with R.F., while Smith had vaginal intercourse with Rochelle. She also testified that Smith did not attempt to stop Lauhead from having intercourse with R.F. After the encounter was finished, the four all got dressed, and Lauhead went home while R.F. returned to her bed. Thereafter, Rochelle never talked to R.F. about what had happened and R.F. did not try to talk to Rochelle about it.

On cross-examination, Rochelle testified that she had been arrested for child abuse with respect to the abuse of R.F. and that, as a result, her testimony in this case was being given pursuant to a plea agreement related to those charges. According to Rochelle, pursuant to the plea agreement, some charges

against her were being dismissed and the State agreed not to attempt to terminate her parental rights.

Rochelle testified that in her initial statement to police regarding the abuse of R.F., she had indicated that she had refused to participate in the sexual activity involving Smith, Lauhead, and R.F. She also testified that in the initial statement, she had said that Smith had touched R.F.'s breasts but she had not said that Smith touched R.F.'s vagina. On cross-examination, Rochelle testified that an examination in October 2016 revealed that R.F. was pregnant and that Rochelle subsequently learned that neither Smith nor Lauhead was the father of the baby.

After Rochelle's testimony was completed, the State called R.F. as a witness. Prior to trial, the State had filed a motion to allow R.F. to testify in camera and outside Smith's presence. The State asserted in the motion that the request was being made pursuant to Neb. Rev. Stat. § 29-1926(1)(d) (Reissue 2016), which generally relates to accommodations for child victims and child witnesses. In this case, the State sought in camera testimony by R.F. because of its concern that R.F. "will be harmed emotionally and psychologically if forced to testify in the presence of . . . Smith." The State further asserted in the motion that R.F., who was 16 years old at the time, "has been diagnosed with Fragile X and functions at a much younger age than her biological age would suggest." The State also requested that R.F.'s guardian ad litem be allowed to sit beside her when she testified.

At a hearing prior to trial, the court stated that its understanding was that Smith's counsel had "indicated that he does not object to the State's motion to allow [R.F.] to testify in camera and with a [guardian ad litem] present." Smith's counsel replied that he was not willing to stipulate to the request. The court therefore took the motion up as a contested matter and allowed the State to argue. In response to the court's questions, the State said that R.F. was 16 years old and that she had "been diagnosed with among other things Fragile X, [and] was

in special education." The State asserted that R.F.'s "biological age [was] much different than her functioning age." After the State presented its argument, Smith stated, "I would object, Judge. I guess [on] the primary basis of confrontation . . . ." Smith requested that the court reserve ruling on the motion until the court had had a chance to voir dire R.F. The court stated that it would delay ruling until voir dire could be made of R.F. at the time of trial.

After the State called R.F. as a witness, the court asked whether the State was withdrawing its motion. The State said that it was not and that it renewed its motion to have R.F. testify in camera. The court stated its understanding that the plan had been to wait until the trial to rule on the motion and decided to move from the courtroom to the jury room in order to hear the motion.

The court began the hearing on the motion by stating that the proceeding was taking place "in the jury room outside the presence of . . . Smith" and that R.F., R.F's guardian ad litem, the State's counsel, and Smith's counsel were present in the jury room. The court explained the proceeding to R.F. and had R.F. take an oath. The State began by asking R.F. general questions regarding her age, her school, and her baby. R.F. testified that she was 16 years old, that she was in 11th grade in high school, that she had a baby, and that she generally took care of the baby but was helped by her foster mother. R.F. also testified that she did not know if she had ever been diagnosed with any illness. The State then asked R.F. whether she remembered that she had come to tell the judge what had happened to her. R.F. replied, "Yes," and the State asked "do you want to do that in front of [Smith]?" R.F. replied, "Um, probably not." The State asked why not, and R.F. replied, "Because I probably going to get scared." The State asked why she would be scared, and R.F. replied, "Because I'm going to probably do is probably I kind of — I'm going to get — probably going to end up doing is probably do is just try." The State then asked questions to establish that R.F.

knew the difference between the truth and a lie and that R.F. was going to tell the truth.

Smith's counsel cross-examined R.F. and elicited testimony that R.F. had talked to several people about what had happened to her. Counsel asked whether R.F. understood that Smith would not get to ask her questions and that instead counsel would ask questions. R.F. replied that she understood and that it did not scare her to be questioned by counsel. Counsel asked whether it would be impossible for R.F. to talk if Smith were in the room, and she replied, "Um, well, I, um, I'm going to be kind of scared." Upon further questioning by Smith's counsel, R.F. stated:

> I probably I don't want to see him because I don't want to and I just think that I just don't want to see him at all. And I really do not want to live with him anymore because I know what happened and I just don't think that he is not a good dad to me.

After Smith's counsel finished questioning R.F., the court said, "All right. [R.F.], I am going to allow you to give your testimony in this room outside the presence of [Smith.]" The court also stated that R.F.'s guardian ad litem would be allowed to stay with her during her testimony. After allowing a brief time for counsel to prepare, the court began R.F.'s testimony by noting for the record that the court was in the jury room with R.F., R.F.'s guardian ad litem, the State's counsel, and Smith's counsel present. The court reminded R.F. that she was under oath, and the State began its direct examination of R.F.

After some initial general questioning, the State asked R.F. whether she remembered "a time when you were in your mom and dad's bedroom with your mom and your dad and [Lauhead]." R.F. replied that she remembered. R.F. testified that Smith came downstairs to her bedroom and took her upstairs. R.F. testified that when she was in Smith and Rochelle's bedroom, Smith took her clothes off and he lay on top of her while he had no clothes on. R.F. testified that Lauhead and Rochelle were also present in the bedroom. The

State used diagrams of male and female bodies to aid R.F.'s testimony. By referencing the diagrams, R.F. indicated that Smith had touched her breasts with his hands. She also testified that both Smith and Lauhead had touched her genital area with "that thing," indicating the genital area of the male body diagram.

After the State completed its direct examination of R.F., Smith's counsel asked to leave the jury room before cross-examining R.F. in order to confer with Smith who had not been present for R.F.'s testimony. The court allowed a break of 5 minutes. The trial thereafter continued with defense counsel's cross-examination of R.F. in the jury room outside of Smith's presence. Smith's counsel questioned R.F. regarding, inter alia, her prior interviews by advocacy counselors.

After R.F.'s testimony was completed, the court returned to the courtroom and the trial continued in Smith's presence. After the State completed its presentation of evidence and rested, Smith moved to dismiss the charges. The court overruled Smith's motion.

Smith testified in his own defense. He generally denied that he had been involved in sexual encounters with Rochelle and Lauhead in March and April 2016. He testified that in late September, he was suspicious that Rochelle was having a sexual relationship with Lauhead. One day while the children were in school, he argued with Rochelle and told her that if she had sexual relations with Lauhead behind his back she might as well have them in front of him. Rochelle led Smith and Lauhead, who was also in the house, to the bedroom where she had sexual relations with Smith while Lauhead watched. After Smith was finished, Rochelle had sexual relations with Lauhead. Smith testified that he watched Rochelle and Lauhead for a while but became disgusted and left. Smith denied that R.F. was involved in the encounter in September, and he denied having had any sexual relations with R.F. or touching her breasts or vagina at any time. Smith testified that in October, one of his younger daughters told him she

had seen Lauhead naked with R.F. Smith had the daughter tell Rochelle what she had seen, and he then went to the police to report what Lauhead had done.

During its cross-examination of Smith, the State recited certain statements and asked Smith whether he had ever made those statements to anyone. Smith denied making the statements. In its rebuttal, the State called as a witness Russell Solky, who in October 2016 had spent 2 days in the Harlan County jail with Smith as his cellmate. Solky testified regarding statements Smith had made to him during that time. The statements Solky recited included some of the statements Smith had just denied having made to anyone during the State's cross-examination of Smith. Solky testified that he and Smith talked about why each of them was in jail and that Smith said that he had been arrested for child molestation and that "his wife made a statement or something like that." Smith also told Solky that his wife "kept breaking his self-esteem down, trying to say that he was a worthless piece of shit, no woman would ever want to be with him." Solky asked Smith whether he had had an affair, and Smith replied that he could not, because "it's a real small town, everybody knows me. . . . [I]f I go to a bar and try to pick somebody up, everybody knows me, I can't do that." During the State's redirect examination, Solky further testified that Smith "said when he wasn't getting [sex] from his wife he was getting it from his kid." When Solky asked which of his children, Smith replied that "it was his special needs daughter."

On cross-examination, Smith elicited testimony from Solky to the effect that charges against Solky had been dismissed in exchange for his testimony in this case. On surrebuttal, Smith testified and denied the statements Solky attributed to him. Smith testified that he had told Solky that he was in jail for "assault," not child molestation.

After all the evidence had been presented, the court ordered a schedule for the parties to submit written closing statements. On November 15, 2017, the court filed an order in which it

found Smith guilty beyond a reasonable doubt of both first degree sexual assault of a child and felony child abuse. In the order, the court reviewed the charges against Smith and the evidence presented at the trial. In connection with its review of R.F.'s testimony, the court stated that it had sustained the State's motion and allowed R.F. to give her testimony in camera. The court stated, "There was evidence during the trial that R.F. is autistic and has Fragile X Syndrome. R.F. clearly suffers from a mental disability. Her manner was very child-like, not at all what you would expect of a 16 year old."

In its order, after reviewing the evidence, the court set forth the reasoning behind its findings of guilt and which evidence it found determinative. The court stated that it found Rochelle's testimony to be credible. The court noted that if Rochelle was lying, it would have been easy for her to say that Smith had penetrated R.F. with his finger or with his penis; the court stated that it was "doubtful that Rochelle knew that under the law, placing your fingers between the lips of the labia or rubbing the top of the vagina was penetration, and thereby, first degree sexual assault." Turning to R.F.'s testimony, the court stated that her testimony alone would not support conviction beyond a reasonable doubt, because R.F.'s testimony was "troubling" and "inconsistent" with regard to whether Smith had assaulted her. But the court stated that it had not "wholly disregarded" R.F.'s testimony, because R.F. was consistent in her testimony that Lauhead had sexually assaulted her and because R.F. had credibly testified that Smith retrieved her from her bedroom and had undressed her. The court further found credible Solky's testimony regarding statements Smith made to him when they were cellmates. The court specifically found credible Solky's testimony regarding Smith's statements concerning the way his wife treated him and how when he was not getting sex from his wife, he would get it from his "special needs daughter."

The court stated that it gave the court pause that Smith was the one who had initially reported Lauhead's sexual assault of

R.F. to police. But the court's concerns appeared to be satisfied by the State's argument that two factors may have prompted Smith's report to police. First, Smith feared that R.F. might be pregnant, and second, Smith's younger daughter had seen Lauhead naked with R.F. These two factors gave Smith reason to fear that "a lot of questions were going to be asked" and gave him motivation to "'rat out'" Lauhead.

Based on the evidence and reasoning set forth above, the court found Smith guilty of first degree sexual assault of a child. Regarding the charge of felony child abuse, the court determined that evidence of Smith's "introducing R.F. into the foursome, penetrating her and not stopping Lauhead from sexually assaulting her is child abuse that meets both prongs of § 28-707 as charged in this case." The court further noted that even if Smith had not himself sexually assaulted R.F., "he would be guilty of child abuse for allowing Lauhead to sexually assault her." The court therefore found Smith guilty of child abuse beyond a reasonable doubt.

The district court thereafter sentenced Smith to imprisonment for 20 to 30 years for first degree sexual assault of a child with a mandatory minimum sentence of 15 years and with credit for time served of 199 days. The court also sentenced him to imprisonment for 2 to 3 years for felony child abuse and ordered the sentence to be served concurrently to the sentence for first degree sexual assault of a child.

Smith appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Smith claims that the district court erred when it heard R.F.'s testimony outside Smith's presence, in violation of § 29-1926 and in violation of Smith's constitutional right of confrontation. Smith, who has new counsel on direct appeal, also claims that trial counsel provided ineffective assistance when counsel (1) failed to call witnesses that Smith had informed counsel he wanted to testify, (2) failed to use video recordings of prior interviews of R.F. to impeach her testimony, and (3) failed

to use a video recording of a prior interview of Rochelle to impeach her testimony. Smith further claims that there was insufficient evidence to support his convictions and that the court imposed excessive sentences.

## STANDARDS OF REVIEW

[1] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination. *State v. Kennedy*, 299 Neb. 362, 908 N.W.2d 69 (2018).

[2] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

[3] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

[4] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018).

[5] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id*.

## ANALYSIS

*District Court Erred by Hearing R.F.'s Testimony Outside Smith's Presence Without Following Constitutional Requirements to Protect Smith's Confrontation Rights, but Such Error Was Harmless Error.*

Smith first claims that the district court erred when it heard R.F.'s testimony outside his presence. He contends that the court's decision violated both § 29-1926 and his constitutional right of confrontation. Smith makes three general arguments with respect to R.F.'s in camera testimony outside his presence. Smith argues that (1) § 29-1926 did not apply to R.F.'s testimony, because the statute does not apply to a witness who is older than 11 years of age; (2) even if § 29-1926 applied, the court failed to make the particularized findings required under the statute; and (3) whether or not § 29-1926 applied, the court infringed upon his constitutional right of confrontation when it heard R.F.'s testimony outside his presence and without making accommodations to protect his right of confrontation. We determine that § 29-1926 did not apply to R.F.'s testimony and did not justify the court's decision to hear R.F.'s testimony outside Smith's presence. We further determine that, to the extent the court had authority outside § 29-1926 to hear R.F.'s testimony in camera rather than in the courtroom, the court's decision to hear R.F.'s testimony outside Smith's presence did not comport with constitutional requirements to protect Smith's right of confrontation. However, given the court's explicit findings in this bench trial, we conclude that the error was harmless.

We first address, without reference to constitutional confrontation requirements, whether § 29-1926 applied to the court's decision to allow R.F. to testify in camera. The State had filed a motion prior to trial in which it requested that R.F. be allowed

to testify at trial in camera pursuant to § 29-1926(1)(d). We note that at both the hearing prior to trial and the hearing immediately prior to R.F.'s testimony, § 29-1926 and its requirements were not explicitly referenced, and that therefore, it is not clear whether the court made its decisions regarding R.F.'s testimony pursuant to § 29-1926 or pursuant to some other authority. Nevertheless, because the State's motion stated that it was made pursuant to § 29-1926(1)(d), we examine the statute and its applicability to this case.

Section 29-1926 generally provides that under specific circumstances, "a child victim of or child witness to" a felony may provide testimony by videotape deposition rather than testifying in court. Section 29-1926(d) provides, "If the child testifies at trial in person rather than by videotape deposition, the taking of the child's testimony may, upon request of the prosecuting attorney and upon a showing of compelling need, be conducted in camera." Section 29-1926(g) also provides, "For purposes of this section, child means a person eleven years of age or younger at the time the motion to take the deposition is made or at the time of the taking of in camera testimony at trial."

At the time of the trial in this case, R.F. was 16 years old. In its motion, the State asserted that R.F. "functions at a much younger age than her biological age would suggest." However, the definition of "child" in § 29-1926(g) refers to the chronological age of "a person eleven years of age or younger." The definition makes no reference to a person who functions at the level of a person 11 years of age or younger.

[6,7] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *State v. McGuire*, 301 Neb. 895, 921 N.W.2d 77 (2018). Giving § 29-1926(g) its plain and ordinary meaning, a "child" for purposes of § 29-1926 is defined as a person whose biological age is 11 years or younger. It is not within the province of the courts to read

a meaning into a statute that is not there or to read anything direct and plain out of a statute. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). We therefore cannot read into § 29-1926 the inclusion of persons whose biological age is over 11 years but whose mental or functional age is equivalent to that of one who is 11 years of age or younger. To the extent there is sentiment that such a witness should be included within the operation of the statute, "the remedy lies with the Legislature to amend" § 29-1926. See *State v. Wright*, 261 Neb. 277, 288, 622 N.W.2d 676, 684 (2001). In this regard, we are aware of at least one other state which has statutes that operate like § 29-1926 but explicitly apply to witnesses with intellectual disabilities. See Fla. Stat. Ann. §§ 92.53 and 92.54 (West Cum. Supp. 2019).

Having determined that § 29-1926 did not apply to R.F.'s testimony in this case, we need not consider whether the court complied with the specific requirements of § 29-1926 when it made its decision. Nevertheless, we note in passing that § 29-1926(h) provides, in part, that "[n]othing in this section [regarding making accommodations] shall restrict the court from conducting the pretrial deposition or in camera proceedings in any manner . . . consistent with the right to confrontation guaranteed in the [federal and Nebraska Constitutions]." These portions of the statute indicate a legislative recognition that the statute applies to a decision to allow a witness to testify outside a courtroom setting but that the decision whether a deposition may be taken or testimony given outside the presence of the defendant is to be determined pursuant to other authority, including constitutional requirements protecting the right of confrontation.

In this regard, Smith's complaint focuses on the fact that R.F.'s testimony was given outside his presence. Thus, our analysis inevitably turns to whether the court's decision to hear R.F.'s testimony outside Smith's presence comported with constitutional requirements to protect his confrontation rights. The U.S. Supreme Court addressed constitutional

confrontation requirements with regard to a child witness' testimony outside the defendant's physical presence in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). In that case, the Court considered a Maryland statute which, unlike our reading of § 29-1926 set forth above, the Maryland court had interpreted to allow the child to testify outside the presence of the defendant. In considering whether the Maryland statute could be used to allow testimony outside the defendant's presence without violating constitutional confrontation rights, the Court set forth principles of confrontation analysis that we believe have application whether a court's decision on how to take witness testimony is made pursuant to a statute or pursuant to some other authority of the court.

[8] In *Maryland v. Craig*, the Court reasoned that while the Confrontation Clause guaranteed a criminal defendant a face-to-face meeting with witnesses appearing before the trier of fact, that guarantee was not an absolute right. The Court further stated that while the face-to-face requirement was not absolute, it could not be disposed of easily. We note that Justice Scalia, joined by three other justices, dissented and questioned whether face-to-face confrontation could be dispensed with even under the standards set forth by the majority. Justice Scalia reasoned that the Confrontation Clause "guarantees specific trial procedures that were thought to *assure* reliable evidence, undeniably among which was 'face-to-face' confrontation." *Maryland v. Craig*, 497 U.S. at 862 (Scalia, J., dissenting) (emphasis in original).

[9] Based on its reasoning that a face-to-face confrontation was not an absolute right but could not be disposed of easily, the Court in *Maryland v. Craig* held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850. The Court then

analyzed the Maryland statutory procedure in light of these two requirements.

The Court in *Maryland v. Craig* first addressed the second requirement—that reliability of the testimony is otherwise assured—and concluded that Maryland's statute preserved "all of the other elements of the confrontation right," which the Court described to include requirements that the witness must be found competent to testify and must testify under oath; that the defendant retained full opportunity for contemporaneous cross-examination; and that the judge, jury, and, notably, the defendant were able to view the demeanor of the witness as he or she testified. 497 U.S. at 851. The Court stated that this final requirement was satisfied, because the statute required use of a one-way closed circuit television procedure through which the court, the jury, and the defendant were able to view the questioning of the witness by prosecutors and defense counsel.

Having found that the statute met the second requirement, the Court indicated that the critical inquiry in *Maryland v. Craig* was whether dispensing with face-to-face confrontation was necessary to further an important public policy. The Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Maryland v. Craig*, 497 U.S. 836, 853, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). The Court cautioned, however, that the "requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.*, 497 U.S. at 855. The Court further stated that the trial court "must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Id.*, 497 U.S. at 856. The Court reasoned that "[d]enial of

face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma," and it noted that general courtroom trauma could be addressed by permitting the child witness "to testify in less intimidating surroundings, albeit with the defendant present." *Id.*, 497 U.S. at 856. The Court finally stated that in order to dispense with face-to-face confrontation, the trial court must further "find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i. e.*, more than 'mere nervousness or excitement or some reluctance to testify.'" *Id.*, 497 U.S. at 856. The Court did not set forth a "minimum showing of emotional trauma required for use of the special procedure," but it found that the standard used in the Maryland statute—that the "child witness will suffer 'serious emotional distress such that the child cannot reasonably communicate'"—was sufficient to meet constitutional standards. *Id.*, 497 U.S. at 856. Having set forth these standards, the Court remanded the cause for further proceedings to determine whether a showing of necessity had been made under these standards. *Maryland v. Craig, supra*.

The Court summarized its holding in *Maryland v. Craig*, 497 U.S. at 857, as follows:

> [W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

We set forth similar standards in *State v. Warford*, 223 Neb. 368, 389 N.W.2d 575 (1986), a case that was decided before *Maryland v. Craig* and before the 1988 enactment of § 29-1926. In *Warford*, the trial court allowed a child victim-witness to

testify in chambers with the judge and counsel for both parties present in chambers, while the defendant and the jury watched from the courtroom by closed-circuit television. We determined that the procedure used by the trial court in *Warford* failed to protect the defendant's right to confrontation under both the federal and Nebraska Constitutions. Similar to the U.S. Supreme Court's subsequent holding in *Maryland v. Craig*, we held in *Warford* that "[t]he right of confrontation is not . . . immune to exception," but that "a limitation of the right can only be necessitated by a showing of a compelling interest and any infringement must be as minimally obtrusive as possible." 223 Neb. at 375, 389 N.W.2d at 580-81.

With respect to the "showing of a compelling interest," we concluded that the record in *Warford* did not show "a compelling need to protect the child witness from further injury." 223 Neb. at 376, 389 N.W.2d at 581. We stated that before the witness could be allowed to testify outside the defendant's presence, there should be "a particularized showing on the record that the child would be further traumatized or was intimidated by testifying in the courtroom in front of the defendant." *Id*. at 377, 389 N.W.2d at 581. With respect to the infringement of the right to confrontation being as minimally obtrusive as possible, we stated that "[a]t the very least, the defendant must at all times have a means of communicating with his attorney, and the court must be able to control the examination by interrupting the questioning to rule on objections." *Id*. We noted that under the procedure used in *Warford*, "[t]he defendant could not physically confront his accuser, nor could he confront the witness through counsel because he had no means of communicating with his attorney," and we concluded that this procedure "unduly inhibited the defendant's confrontation right and was therefore constitutionally objectionable." 223 Neb. at 377, 389 N.W.2d at 582.

We review the procedure used by the district court in this case under the standards set forth in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), and in

*Warford*. As did the Court in *Maryland v. Craig*, we first look to the second requirement—whether reliability of the testimony is otherwise assured despite the absence of face-to-face confrontation, or as stated in *Warford*, whether the infringement of a defendant's right of confrontation was as minimally obtrusive as possible. The Court in *Maryland v. Craig* found this requirement was met, because the Maryland statutory procedure preserved all the other "elements" of confrontation, including that the witness must be found competent to testify and must testify under oath; that the defendant retains full opportunity for contemporaneous cross-examination; and that the judge, jury, and the defendant are able to view the demeanor of the witness as he or she testified. 497 U.S. at 851. In the present case, R.F. was found competent to testify and she testified under oath. This was a bench trial, so the jury's ability to view the witness was not relevant, but the court, as the fact finder, was able to view R.F. as she testified.

However, because Smith was not able to view R.F.'s demeanor as she testified, whether by closed-circuit television or otherwise, the procedure in this case fell short of that set forth in *Maryland v. Craig* in a significant way. This failure limited Smith's ability to confront R.F., because he was not able to advise counsel on matters that he observed that might provide avenues to challenge the credibility of R.F. Furthermore, in *Warford*, we stated that the defendant must at all times have a means of communicating with his attorney. Although in the present case the court allowed Smith's attorney to briefly meet with Smith after R.F.'s direct testimony and before the cross-examination, the procedure did not fully protect Smith's right of confrontation, because he had not been able to view R.F.'s direct testimony and he was not able to communicate with his attorney during R.F.'s direct testimony or during the cross-examination.

Turning to the requirement in *Maryland v. Craig* that infringement of the right of confrontation must be found to be necessary to further an important public policy, or, as stated

in *State v. Warford*, 223 Neb. 368, 389 N.W.2d 575 (1986), a showing of a compelling interest, we acknowledge that there is an important public policy in protecting young victims who may be retraumatized by testifying in front of a defendant. In this respect, we note that Nebraska's public policy has been expressed, at least to some extent, in § 29-1926, and as discussed above, the present case does not fit within the public policy stated in § 29-1926, because R.F. was 16 years old and the statute applies only to those 11 years of age and younger. Also as noted above, even when § 29-1926 applies, it does not explicitly allow for testimony outside the presence of the defendant and it does show a legislative intent to respect the defendant's right of confrontation, including the right to face-to-face confrontation. Taking guidance from the constitution, cases, and statute, we cannot unreservedly state that adherence to a generally recognized important public policy or compelling interest was demonstrated in this case.

We believe that in the absence of an express public policy that covers a specific case, before an infringement of confrontation rights can be justified in a specific case, it is vital under *Maryland v. Craig* that there is a clear determination of the justification made on a case-specific basis.

In *Warford*, we required "a particularized showing on the record that the child would be further traumatized or was intimidated by testing in the courtroom in front of the defendant." 223 Neb. at 377, 389 N.W.2d at 581. Although it does not apply here, § 29-1926(h) requires "particularized findings on the record" to determine that "there is a compelling need that child testimony accommodation is required." But, foremost, the constitutional requirements for several ultimate findings were set forth in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). That decision mandates those findings, at a minimum.

In the present case, the court held a hearing to determine whether R.F. could testify outside Smith's presence. However, after the hearing, the court did not make the ultimate findings

mandated by *Maryland v. Craig*, which, in essence, require a compelling interest to support its decision to allow R.F. to testify outside Smith's presence. Instead, at the end of the hearing, the court simply told R.F. that it would allow her to testify in camera outside Smith's presence. As set forth in *Maryland v. Craig*, the requisite findings include findings that (1) the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant, and (2) "the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i. e.*, more than 'mere nervousness or excitement or some reluctance to testify.'" 497 U.S. at 856. The Court noted in this respect that general courtroom trauma could be addressed by permitting the child witness "to testify in less intimidating surroundings, albeit with the defendant present," thus respecting the defendant's confrontation right. *Id.*, 497 U.S. at 856. Incidentally, this is consistent with the terms of § 29-1926, which we see as protecting the child witness from courtroom trauma while protecting the defendant's right of confrontation.

We read the record before us, but without the benefit of such findings. R.F.'s responses during the hearing indicate feelings of nervousness, excitement, or reluctance to testify in the presence of Smith, but not necessarily severe emotional distress. R.F. understandably states that she does not want to be around Smith, but she frames her aversion as not wanting to live with him again because he is not a good parent. When asked whether she wants to testify in front of Smith, she says that she does not and expresses nervousness but concludes that what she will "probably do is just try." This does not clearly show that R.F. would suffer trauma that would prevent her from being able to communicate.

In the absence of the ultimate findings required by *Maryland v. Craig*, it is difficult for us to determine from the cold record of R.F.'s statements how the prospect of testifying in front of Smith affected her; nonverbal cues and body language could inform an impression that her words do not. And although

not a requirement, it might have been productive in this case to have testimony from an expert or someone who knew R.F. well to indicate the effect testifying in front of Smith could have had on R.F. Furthermore, in the record before us, there are assertions that R.F. suffers certain developmental impairments, but it is not clear whether there has been expert evidence regarding her level of functioning or how testifying in Smith's presence might cause her a special trauma due to a disability.

Given the applicable law and record in this case, we conclude the procedure used was constitutionally deficient. We note that in the present case, there were not sufficient particularized findings to support a public policy or a compelling interest to curtail Smith's confrontation rights. We further determine that there were not adequate procedures to compensate for the lack of face-to-face confrontation, mainly because Smith was not able to view R.F.'s testimony, even remotely, and he did not have communication with counsel at all times. Based on these shortcomings, we conclude that the court's decision to hear R.F.'s testimony outside Smith's presence did not comport with constitutional confrontation requirements as set forth in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), and *State v. Warford*, 223 Neb. 368, 389 N.W.2d 575 (1986).

[10] Although the court erred in hearing R.F.'s testimony outside Smith's presence without adequately safeguarding Smith's confrontation rights, such error is subject to harmless error review. We have said that a violation of a defendant's constitutional right of confrontation that results in the improper admission of evidence is trial error subject to harmless error review. See *State v. Leibel*, 286 Neb. 725, 838 N.W.2d 286 (2013). The U.S. Supreme Court has said that an unconstitutional "denial of face-to-face confrontation," like other types of violations of the Confrontation Clause, is subject to harmless error review. *Coy v. Iowa*, 487 U.S. 1012, 1021, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988).

[11,12] Where the trial error is of a constitutional dimension, the burden must be on the beneficiary of the error to prove beyond a reasonable doubt that the error did not contribute to the verdict obtained. *State v. Leibel, supra*. This standard applies equally to jury and bench trials. *Id*. Whether error is harmless in a particular case depends "'upon a host of factors,'" and we find the fact of a bench trial a proper consideration in conducting our harmless error review. *Id.* at 740, 838 N.W.2d at 298. Harmless error review ultimately looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*. As outlined below, we find the error in this case to be harmless.

In our harmless error review in this case, we consider whether Smith's convictions were surely unattributable to R.F.'s in camera testimony outside Smith's presence. If this were a jury trial, it would be challenging for an appellate court to say that a conviction for sexual assault was surely unattributable to the alleged victim's testimony. However, in this case, there was a bench trial and we have the benefit of the court's order which set forth in detail the reasoning behind the court's finding of guilt beyond a reasonable doubt. In that order, the court specifically stated that R.F.'s testimony, standing alone, would not support conviction beyond a reasonable doubt and the court described her testimony as "troubling" and "inconsistent." Instead, the court relied mainly on Rochelle's testimony to establish the elements of the offenses and it characterized R.F.'s testimony as merely helpful to the extent it corroborated portions of Rochelle's testimony. The court also cited Solky's testimony regarding Smith's statements in jail as an important factor in its verdicts.

We think that the court's order makes clear that the error in hearing R.F.'s testimony outside Smith's presence was harmless error in at least two respects. First, the court relied on

evidence other than R.F.'s testimony and R.F.'s testimony was helpful only to the extent it corroborated other evidence. Second, despite Smith's absence at the time of R.F.'s testimony, the presence of other "elements" of the right of confrontation, particularly cross-examination by defense counsel, was sufficient to call the credibility of R.F.'s testimony into doubt; this is evidenced by the court's limited reliance on her testimony and the court's explicit statement that R.F.'s testimony alone would not have supported conviction.

Given the court's order and the record, we determine that the court's verdicts were surely unattributable to R.F.'s testimony and more specifically that they were surely unattributable to R.F.'s testimony that was given outside Smith's presence in violation of his right of confrontation. We therefore conclude that although the court erred by allowing R.F. to testify outside Smith's presence without following constitutional requirements to protect Smith's right of confrontation, such error was harmless error and does not require reversal of Smith's convictions.

*Smith's Claims of Ineffective Assistance of Counsel Cannot Be Reviewed on Direct Appeal but Are Stated With Sufficient Particularity to Be Preserved for Postconviction Review.*

[13] Smith next claims that his trial counsel provided ineffective assistance in various respects. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). Smith has different counsel on appeal, and Smith specifically claims that his trial counsel provided ineffective assistance when counsel (1) failed to call witnesses that Smith had informed counsel he wanted to testify, (2) failed to use

video recordings of prior interviews of R.F. to impeach her testimony, and (3) failed to use a video recording of a prior interview of Rochelle to impeach her testimony.

[14,15] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

With regard to his claim that trial counsel failed to call witnesses, Smith states in his brief that the three persons trial counsel failed to call were named "Linda Mask, Verlon Mask, and Sherri Hopkins." Brief for appellant at 15. He argues that the record on direct appeal is not sufficient to address this claim, because the record does not disclose what testimony the witnesses would have provided, nor does it disclose counsel's reasons for failing to call the witnesses. Smith states that he raised the claim and named the potential witnesses in order to preserve the claim for postconviction review.

In response, the State notes that the record indicates that Smith might have intended to refer to "'Linda Mast'" and "'Verlon Mast,'" rather than "'Linda Mask'" and "'Verlon Mask.'" Brief for appellee at 14. However, the State agrees with Smith's argument that the record on direct appeal is not sufficient to review the claim and that Smith sufficiently alleged the claim to preserve it for postconviction review.

Smith further claims that counsel failed to impeach the testimony of both R.F. and Rochelle by using video recordings of prior interviews that each witness had given. Smith argues that the record is not sufficient to review these claims on direct appeal because the full video recordings are not in the

record. The State concedes that each of these claims was suf-
ficiently alleged by Smith, but the State argues that the record
on direct appeal is sufficient to review each claim and that the
record demonstrates that each claim is without merit. The State
notes that Smith used statements from the prior interviews to
impeach each of the witnesses and that each of the witnesses
admitted to making the statements. However, Smith argues in
reply that the record shows only the statements that trial coun-
sel actually used to impeach the witnesses, but it does not show
statements that could or should have been used to impeach the
witnesses' testimony.

We determine that with regard to his claim that trial coun-
sel failed to call witnesses, Smith sufficiently identified three
particular potential witnesses. We further determine that with
regard to his claims that trial counsel failed to use prior inter-
views to impeach the testimony of witnesses, Smith identified
two particular witnesses and the particular prior interviews of
each witness. We conclude with respect to each of these three
claims of ineffective assistance of trial counsel that the record
on direct appeal is not sufficient to review the claim but that
Smith alleged the claim with sufficient particularity to preserve
the claim for postconviction review.

*The Evidence Was Sufficient to*
*Support Smith's Convictions.*

Smith next claims that there was not sufficient evidence to
support his convictions. With respect to his conviction for first
degree sexual assault of a child, Smith contends that there was
no evidence that he had sexually penetrated R.F. With respect
to his conviction for child abuse, Smith concedes that the
testimony of R.F. and Rochelle could establish the elements
of child abuse but he contends that the testimony was not
credible. We conclude there was sufficient evidence to support
both convictions.

One is guilty of first degree sexual assault of a child under
§ 28-319.01(1)(b) "[w]hen he or she subjects another person

who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older." Smith does not dispute that there was sufficient evidence that R.F. was at least 12 but less than 16 years of age and that he was 25 years of age or older at the time of the alleged incident. But he contends that there was no evidence that he subjected R.F. to "sexual penetration" which is defined under Neb. Rev. Stat. § 28-318(6) (Reissue 2016) to include, inter alia, "any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body."

In this case, Rochelle testified that Smith touched R.F.'s vagina during the group encounter. When asked by the State to describe how Smith had touched R.F.'s vagina, Rochelle described Smith's actions as "putting his hand on it," "rubbing it," and "fondling the top of it." Upon further questioning, Rochelle testified that she had not seen Smith put his finger inside R.F.'s vagina, but when the State asked whether Smith had touched R.F. "between the skin folds known as the labia," Rochelle replied, "Yes." The State then asked how long Smith had touched R.F. "between the lips of her vagina," and Rochelle replied that he had done so for "[m]aybe three to five seconds" and that she had seen him touch R.F. in this way "[j]ust once."

Based on our precedent, we determine that evidence that Smith had touched R.F. "between the skin folds known as the labia" and "between the lips of her vagina" was sufficient to support a finding of sexual penetration. Interpreting the definition of "sexual penetration" quoted above, we have said:

The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient.

*State v. Archie*, 273 Neb. 612, 642, 733 N.W.2d 513, 536 (2007). See, also, *State v. Kays*, 21 Neb. App. 376, 838 N.W.2d

366 (2013), *disapproved on other grounds, State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014), and *State v. Newman*, 21 Neb. App. 29, 838 N.W.2d 317 (2013). Rochelle's testimony that Smith touched the "skin folds known as the labia" and "between the lips of her vagina" was sufficient to prove entry of the vulva or labia and therefore to support a finding of sexual penetration and a conviction for first degree sexual assault of a child.

One is guilty of child abuse under § 28-707(1) if

he or she knowingly, intentionally, or negligently causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or physical or mental health; [or]

. . . .

(e) Placed in a situation to be sexually abused as defined in section 28-319, 28-319.01, or 28-320.01[.]

The offense is a Class IIIA felony under § 28-707(4) if the offense is committed knowingly and intentionally and does not result in serious bodily injury.

Evidence supporting the conviction for child abuse included Rochelle's testimony that Smith brought R.F. into the group sexual encounter, wherein Smith subjected R.F. to sexual contact and sexual penetration and allowed Lauhead to subject R.F. to sexual penetration.

Smith does not argue that such testimony, if believed, would not support a finding that he had placed R.F. in a situation to be sexually abused. Instead, he attacks the credibility of Rochelle and argues that a fact finder could not have found her testimony believable.

As discussed above in connection with our harmless error analysis, the court in this bench trial made specific findings regarding the credibility and reliability of witnesses, including Rochelle. In reviewing a conviction for sufficiency of the evidence, we do not pass on the credibility of witnesses and instead we recognize that it is a matter for the fact finder. See *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018).

Viewing the evidence in this case in the light most favorable to the prosecution, we conclude that based on its witness credibility assessment, the court could have found the elements of felony child abuse had been proved beyond a reasonable doubt.

We conclude that there was sufficient evidence to support Smith's convictions for first degree sexual assault of a child and felony child abuse.

*District Court Did Not Abuse Its*
*Discretion in Sentencing Smith.*

Smith finally claims that the district court imposed excessive sentences. We find no abuse of discretion in the court's sentencing of Smith.

Under § 28-319.01(2), first degree sexual assault of a child is a Class IB felony with a mandatory minimum sentence of 15 years in prison for the first offense. Child abuse committed knowingly and intentionally that does not result in serious bodily injury is a Class IIIA felony under § 28-707(4). Under Neb. Rev. Stat. § 28-105(1) (Reissue 2016), a Class IB felony is punishable by imprisonment for a minimum of 20 years and a maximum of life, and a Class IIIA felony is punishable by imprisonment for a maximum of 3 years. Smith was sentenced to concurrent terms of imprisonment for 20 to 30 years for first degree sexual assault of a child with a mandatory minimum sentence of 15 years and for 2 to 3 years for felony child abuse. Therefore, Smith's sentences were within statutory limits and we review his sentencing for an abuse of discretion.

[16-18] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Mueller, supra.* In determining a sentence to be imposed, relevant factors customarily considered and

applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Smith focuses mainly on the sentence for first degree sexual assault of a child and contends that given certain factors, imprisonment for a term of 15 to 20 years would have been a more appropriate sentence than the term of 20 to 30 years that was imposed. Smith asserts that certain factors mitigate for a lesser sentence including that he is "an extremely low risk individual," see brief for appellant at 32; his criminal history was minimal; he has no substance abuse issue; an evaluation showed that he was not violent and did not meet the criteria to be classified as a pedophile; and he is an honorably discharged veteran who was disabled because of a combat injury.

As Smith acknowledges, at the sentencing hearing, the court stated that it had considered the results of testing that had been done as part of a presentence evaluation, as well as Smith's lack of a criminal record, his military service, and his disability. But the court stated it had also considered that Smith had sexually assaulted a person who the record indicates was disabled and that he had continued to deny responsibility. Given that the court considered the factors urged by Smith, that the record does not show the court considered improper factors, and that the offense carried a potential maximum sentence of imprisonment for life, we cannot say that the sentence of imprisonment for 20 to 30 years was an abuse of discretion. We determine that the district court did not abuse its discretion in sentencing Smith.

## CONCLUSION

We conclude that the district court's decision to hear R.F.'s testimony outside Smith's presence did not comport with constitutional requirements to protect Smith's right of confrontation; however, in this bench trial, given the court's order detailing its findings, the error was harmless error and does not require reversal of Smith's convictions. We further conclude that the record on direct appeal is not sufficient to review Smith's claims of ineffective assistance of trial counsel but that Smith alleged the claims with sufficient particularity to preserve the claims for postconviction review. We finally conclude that there was sufficient evidence to support Smith's convictions and that the district court did not abuse its discretion in sentencing Smith. We therefore affirm Smith's convictions and sentences for first degree sexual assault of a child and felony child abuse.

AFFIRMED.