Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/18/2019 09:06 AM CDT

State of Nebraska, appellee, v. Wilder A.
Interiano Alvarado, appellant.

___ N.W.2d ___

Filed June 11, 2019.    No. A-18-052.

1.  **Convictions: Evidence: Appeal and Error.** In reviewing a criminal
    conviction for a sufficiency of the evidence claim, whether the evidence
    is direct, circumstantial, or a combination thereof, the standard is the
    same: An appellate court does not resolve conflicts in the evidence, pass
    on the credibility of witnesses, or reweigh the evidence; such matters
    are for the finder of fact. The relevant question for an appellate court
    is whether, after viewing the evidence in the light most favorable to the
    prosecution, any rational trier of fact could have found the essential ele-
    ments of the crime beyond a reasonable doubt.
2.  **Sentences: Appeal and Error.** An appellate court will not disturb a sen-
    tence imposed within the statutory limits absent an abuse of discretion
    by the trial court.
3.  **Effectiveness of Counsel: Appeal and Error.** Whether a claim of inef-
    fective assistance of trial counsel may be determined on direct appeal is
    a question of law.
4.  **Sentences.** When imposing a sentence, the sentencing court should cus-
    tomarily consider the defendant's (1) age, (2) mentality, (3) education
    and experience, (4) social and cultural background, (5) past criminal
    record or record of law-abiding conduct, and (6) motivation for the
    offense, as well as (7) the nature of the offense and (8) the violence
    involved in the commission of the offense. However, the sentencing
    court is not limited to any mathematically applied set of factors.
5.  **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a
    defendant's trial counsel is different from his or her counsel on direct
    appeal, the defendant must raise on direct appeal any issue of trial
    counsel's ineffective performance which is known to the defendant or
    is apparent from the record, otherwise, the issue will be procedurally
    barred in a subsequent postconviction proceeding.

6. **Effectiveness of Counsel.** As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument.

7. ____. Defense counsel does not perform in a deficient manner simply by failing to make the State's job more difficult.

8. ____. The Sixth Amendment guarantees a right not just to counsel, but to effective assistance of counsel.

9. **Effectiveness of Counsel: Presumptions.** If counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.

10. **Trial: Attorney and Client: Effectiveness of Counsel: Testimony: Waiver.** Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.

Appeal from the District Court for Lancaster County: Jodi L. Nelson, Judge. Affirmed.

Darik J. Von Loh, of Hernandez Frantz, Von Loh, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Riedmann, Bishop, and Welch, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Wilder A. Interiano Alvarado appeals his conviction and sentence for first degree sexual assault, claiming that the evidence was insufficient to support his conviction and that the sentence imposed was excessive. Based upon our standard of review, we affirm his conviction and sentence. Alvarado also asserts multiple claims of ineffective assistance of counsel which we address below.

## II. BACKGROUND

B.H., a 22-year-old college student, attended a St. Patrick's Day party at the law firm at which she was working on March

17, 2017. She consumed approximately 2½ "Solo cups" of alcoholic beverages between the hours of 5 and 8:30 p.m. At that point, she felt "buzzed." She left the law firm with one of the attorneys and traveled with him in his car to a nearby bar. They stayed at the bar until about 11:30 p.m., during which time she consumed another 1½ to 2 alcoholic beverages. About halfway through the first of those drinks, B.H. started to "get fuzzy," and by the time she stopped drinking the second drink, she was "losing [her] balance" and felt "intoxicated." When they exited the bar, she tried to perform field sobriety tests to determine her level of intoxication and determined she was unable to keep her balance. They decided to "split an Uber," a ride-sharing service, that would take each of them to their respective houses.

The attorney that accompanied B.H. to the bar testified that he decided it was time for them to leave the bar when B.H. "started rubbing her back against" the man on the barstool next to her. When B.H. paid her bar bill, she wrote her name "four or five times" on the charge slip and pretended that she was going to take the tip money that the attorney set on the bar. The attorney testified that based upon the way B.H. was acting, he would not have been comfortable letting her drive his car home from the bar and he did not want to drive because he, too, had been drinking.

B.H. has little recollection of the Uber ride home. The Uber driver testified that when B.H. and the attorney got in her car, B.H. was "chatty," but then she got "rather tired-like." She described the decline as if "she drank a bottle of cold medicine . . . she just became this really zoned-out kind of person." According to the driver, B.H. was leaning against her companion "to brace herself." After they dropped off the attorney, B.H. leaned against the door and then "sprawl[ed] out along the back seat" and began singing along to the radio. The driver described B.H.'s speech as "sloshy slurry" but not necessarily intoxicated. By the time they reached B.H.'s house, B.H. was asleep and it took the driver "a little bit to actually wake her

up." Upon exiting the car, B.H. "had to catch herself" and used a "zombie walk" to her door. The driver saw B.H. search her purse and then disappear around the side of the house before the driver left for her next trip.

According to B.H., when she arrived at her house, she realized that she had left her house key in her car, which was parked at the law firm. She recalls talking on her cell phone to her boyfriend and one of her friends, who were already downtown, to ask for a ride, but they had been drinking and did not want to drive. She planned to call an Uber, but when she tried to use her cell phone, it looked like "the setting had been changed to, like, Japanese or something." At that point, B.H. started walking toward downtown. She recalled "taking five steps on the sidewalk" in front of her house, but does not remember walking beyond that.

The evidence reveals that B.H. planned to stop at her house near 9th and F Streets in Lincoln, Nebraska, get something to eat, and then head downtown to meet her friends and boyfriend. According to a friend of B.H., she had texted B.H. several times throughout the night. At approximately 8:30 p.m., B.H. indicated that she planned to meet them downtown. At about 10:30 p.m., she sent B.H. a text to let her know that B.H.'s boyfriend had joined them downtown. And then about midnight, in a cell phone conversation, B.H. said that she had taken an Uber home and that she was going to walk downtown to meet them. At some point in the conversation, B.H. said she was across the street from her house, which her friend interpreted to mean she was across 10th Street on her way downtown. When B.H. did not arrive, the friend continued to send text messages to B.H. and call her, but she did not receive any response. When B.H. did not arrive, the friends set out on foot and bicycle to find her, but were unable to do so.

B.H. testified that she had a "snapshot" memory of sitting in a kitchen with a man, who was later identified as Alvarado. She did not know him prior to March 17, 2017. She also had a memory of lying on her back with Alvarado on top of her.

In the early morning hours of March 18, 2017, B.H. awoke, naked, in a strange bed. Alvarado was lying next to her with one hand on her breast and the other hand touching her "[i]nside of the lips" of her vagina. When she tried to get out of the bed, he held her down and told her "stay, stay; you're so beautiful." B.H. was ultimately able to free herself, locate her clothes, and retrieve her cell phone from him. When she ran out of the house, she realized she was across the street and approximately one-half block from her house. She ran home, where her boyfriend and friend were waiting.

Upon her arrival, her boyfriend and friend told her that they had reported her missing the night before so they needed to call the police to let them know she was home. The police responded, interviewed B.H., and took her to the hospital for a forensic examination. While at the hospital, investigators asked B.H. to "go through" her cell phone. She located a photograph of the inside of a house that she did not recognize. Based on the photograph and information from B.H., the police canvassed the area and Alvarado was arrested and charged with first degree sexual assault, a Class II felony, and false imprisonment, a Class IIIA felony.

At trial, the evidence revealed that B.H. did not remember text messages that her friend had sent the night of March 17, 2017, and early morning of March 18, nor did she remember conversations that her cell phone reflected she had. Her cell phone also contained video of her trying to get into her house after the Uber driver dropped her off, but B.H. did not recall taking that video.

The State produced photographs taken after the incident of various bruises on B.H., as well as photographs of Alvarado depicting scratches and cuts on his back, side, chest, neck, and face. B.H.'s gynecologist testified that scratch marks would be consistent with an individual trying to resist sexual intercourse. He further testified that shortly after this incident, B.H. was diagnosed with genital herpes. The evidence revealed that Alvarado had herpes. Results of the forensic examination were

also presented that revealed the presence of DNA from both Alvarado and B.H. on samples taken from Alvarado's penis shaft and from around B.H.'s rectum.

Following a jury trial, Alvarado was found guilty of first degree sexual assault and was acquitted on the charge of false imprisonment. He was sentenced to 25 to 35 years' imprisonment with credit for 298 days served. Alvarado timely appeals.

## III. ASSIGNMENTS OF ERROR

Alvarado assigns, restated and renumbered, that the district court erred in (1) finding him guilty of first degree sexual assault, because the evidence was insufficient, and (2) imposing an excessive sentence. Alvarado also asserts that trial counsel was ineffective for stipulating to certain exhibits, in failing to object to other exhibits and testimony, and in instructing Alvarado not to testify.

## IV. STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy*, 301 Neb. 343, 918 N.W.2d 292 (2018).

[2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

[3] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). In reviewing claims of ineffective assistance of counsel on

direct appeal, an appellate court decides only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance? *Id*.

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Alvarado argues that the evidence was insufficient to prove the elements of first degree sexual assault beyond a reasonable doubt. This argument ignores recent case law and the circumstantial evidence that was presented at trial.

First degree sexual assault is defined as follows:

Any person who subjects another person to sexual penetration (a) without the consent of the victim, (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct, or (c) when the actor is nineteen years of age or older and the victim is at least twelve but less than sixteen years of age is guilty of sexual assault in the first degree.

Neb. Rev. Stat. § 28-319(1) (Reissue 2016).

Under the facts of this case, subsection (c) of § 28-319 is inapplicable; therefore, the State was required to prove either that Alvarado sexually penetrated B.H. without her consent or that he knew or should have known that she was mentally or physically incapable of resisting or appraising the nature of his conduct. Alvarado claims that the "touching and 'petting' of the alleged victim's vaginal lips" is not enough to find penetration. Brief for appellant at 24. However, the Nebraska Supreme Court recently addressed this issue in *State v. Smith*, 302 Neb. 154, 922 N.W.2d at 444 (2019).

In *State v. Smith, supra*, the defendant argued that the evidence was insufficient to convict him of first degree sexual assault of a child because there was no credible evidence he

had sexually penetrated the child. Rather, the evidence was that he had touched her "'between the skin folds known as the labia'" and "'between the lips of her vagina.'" *Id*. at 183, 922 at 465. Relying upon Neb. Rev. Stat. § 28-318(6) (Reissue 2016), the court defined sexual penetration to include, inter alia, "'any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body.'" *Id*.

Quoting *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007), the *Smith* court iterated: "'The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient.'" 302 Neb. at 183, 922 N.W.2d at 465.

In the present case, B.H. testified that when she awoke on March 18, 2017, Alvarado was touching her "[i]nside of the lips" of her vagina. This evidence was sufficient for the jury to determine Alvarado sexually penetrated B.H.

In addition to the penetration on the morning of March 18, 2017, circumstantial evidence supports a finding of penetration the night of March 17. B.H. testified that following this incident, her vagina was sore. Alvarado points to testimony that B.H. did not have any physical evidence of a vaginal injury; however, a gynecologist testified that one would not necessarily expect to see a traumatic injury to the vaginal area from nonconsensual intercourse if the patient had prior sexual activity. Additionally, B.H. testified that she was menstruating on March 17 and that she was using tampons. Her normal practice was to flush a used tampon down the toilet and insert a new one. However, a used tampon containing B.H.'s blood was found in the trash at Alvarado's apartment and B.H. awoke without a tampon in her vagina. She had no recollection of removing her tampon that night.

Furthermore, the rectal swab taken from B.H. revealed semen with a DNA profile that included Alvarado as a contributor

with a population frequency of 1 in 31.96 sextillion. B.H. was included as a contributor of the DNA sample taken from Alvarado's penis shaft. The evidence was therefore sufficient for a jury to find penetration.

Alvarado argues that if penetration is found, "then this case turns solely on the intoxication of the victim." Brief for appellant at 24. He relies upon *State v. Rossbach*, 264 Neb. 563, 650 N.W.2d 242 (2002), for the proposition that the issue of consent is not reached if the alleged victim is intoxicated to the point to be incapable of resisting or apprising the nature of her conduct. Relying on an exhibit, a Nebraska State Patrol Crime Laboratory report, he claims there was no alcohol in B.H.'s urine when tested. He cites B.H.'s testimony that she consumed four drinks, but that she did not believe them to be particularly strong. He claims there is a lack of evidence that B.H. was physically or mentally incapable of resisting or appraising the nature of her conduct.

The State presented evidence regarding the amount of alcohol B.H. consumed, what she had eaten that day, and her approximate weight. The attorney that accompanied B.H. to the bar testified as to her behavior, as did the Uber driver. B.H., herself, testified to her inability to operate her cell phone and her lack of recollection of the night's events. From this evidence, the jury could conclude that B.H. was intoxicated and incapable of resisting or appraising the nature of her conduct.

But even if the evidence was insufficient for a jury to conclude that B.H. was intoxicated beyond the point of resisting or appraising the nature of her conduct, first degree sexual assault can also be found where sexual penetration occurs without the consent of the victim. See § 28-319(1)(a). B.H. testified that she was sleeping while Alvarado was touching her inside the lips of her vagina; therefore, she could not have given consent. A jury could have determined on the basis of this testimony that Alvarado sexually penetrated her without her consent.

Additionally, the physical evidence depicted in the photographs of Alvarado taken after the incident shows numerous red marks and scratches. He is shown with scratches and cuts to his side, chest, face, and neck. One of the investigating officers testified that those injuries were "consistent with fingernail markings." B.H., likewise, had numerous bruises that appeared over the course of the next 2 days that were not there before the incident. The nurse who performed the forensic examination testified B.H. had red marks, "like, finger mark[s]," on her hips. Viewing the evidence in the light most favorable to the State, a jury certainly could have determined that these marks were a result of B.H.'s resisting Alvarado's advances the night before, and thus, that there was nonconsensual sexual penetration.

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005). Reviewing the evidence in this matter, we determine that there was sufficient evidence from which the jury could have determined that B.H. did not consent. The photographs introduced at trial show bruising to various parts of B.H.'s body. Additionally, and perhaps more compelling, are the photographs of scratches and cuts on Alvarado's back, chest, side, neck, and face. This evidence, coupled with the gynecologist's testimony that such markings are consistent with an individual's resisting sexual intercourse, provides ample support for the jury to conclude that B.H. did not consent to sexual penetration.

## 2. Excessive Sentence

Alvarado's assigned error regarding the court's sentence is that the district court failed to consider the relevant sentencing factors when imposing sentence upon him. We disagree.

[4] When imposing a sentence, the sentencing court should customarily consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. However, the sentencing court is not limited to any mathematically applied set of factors. See *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

At sentencing, the court indicated that it had reviewed the presentence investigation. Our review of that same presentence investigation reveals information regarding Alvarado's age, mentality, education and experience, social and cultural background, and past criminal record. Additionally, the court stated that having sat through the trial, it was clear to the court that Alvarado took advantage of B.H. "in ways that should never happen to anyone." Before imposing its sentence, the court indicated that by "virtue of comments made in the pre-sentence, [Alvarado] does not take full responsibility for his actions in this case." The court further noted the impact his actions had on B.H. and her family. As a result, it found that "[h]aving regard for the nature and circumstances of this crime, . . . Alvarado's history, character and condition; I absolutely find that imprisonment is necessary for the protection of the public."

We find nothing in the court's sentencing to support a determination that it failed to consider the appropriate factors; to the contrary, the record reflects that it did consider the appropriate factors and based upon what it found, a sentence of imprisonment was necessary. Alvarado was convicted of a Class II felony, which carries with it a maximum sentence of 50 years' imprisonment and minimum sentence of 1 year's

imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 2016). He was sentenced to 25 to 35 years' imprisonment. This is well within the statutory guidelines, and we find no abuse of discretion.

### 3. Ineffective Assistance of Counsel

[5] Alvarado, who has new counsel on appeal, claims that his trial counsel provided ineffective assistance in nine separate ways, which we condense to six. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

### (a) Stipulation to Exhibits

Defense counsel stipulated to exhibits regarding herpes virus testing of both B.H. and Alvarado, chain of custody of urine samples, and chain of custody of medical items from B.H. Alvarado asserts that counsel was ineffective for stipulating to these exhibits. We find the record is insufficient to address the issue of trial counsel's failure to question the gynecologist regarding the exhibits relating to the herpes virus, but that the record refutes the remaining claims.

Alvarado claims that the herpes virus testing results should have been objected to and that their admission should have been challenged through a motion in limine. However, one of the elements of the charged crime was penetration. Medical evidence at trial indicated that the herpes virus can be transferred via oral or vaginal intercourse and that skin-to-skin contact is necessary. Its incubation period is 2 to 12

days. B.H. testified that a few days after the incident, she came down with a fever and began experiencing vaginal lesions. A culture taken on March 24, 2017, confirmed that B.H. had genital herpes. She had not been infected with the virus before.

[6] The testimony and exhibits regarding herpes were relevant and admissible to support a finding that penetration occurred. Therefore, a motion in limine likely would not have been successful. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). Counsel was not ineffective for failing to challenge the admissibility of herpes evidence through a motion in limine.

Alvarado also asserts that counsel should have questioned B.H.'s gynecologist regarding the interpretation of the test results. His failure to do so does not require a reversal, because although Alvarado has accurately described what was not done, the record does not show why trial counsel did not explore this issue on cross-examination. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). Because the undisputed facts in the record cannot conclusively determine whether counsel did or did not provide effective assistance and whether Alvarado was prejudiced by the alleged deficient performance, the record is not sufficient to address the claim on direct review.

[7] Alvarado asserts that counsel was ineffective for stipulating to the herpes virus test results and to the chain of custody items in the exhibits because Alvarado received no benefit from the stipulation. However, defense counsel does not perform in a deficient manner simply by failing to make the State's job more difficult. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). Alvarado "surmised" that the State could not have proved the chain of custody; hence, the need for the stipulation. Brief for appellant at 13. However, he does not support this surmise with any reason for it. We therefore reject this assigned error. See *State v. Ash, supra*.

### (b) Photographs of B.H.
### and Alvarado

Numerous photographs of both B.H. and Alvarado were offered into evidence by the State without objection from Alvarado's counsel. Alvarado claims that counsel was deficient in not objecting to the exhibits on the basis of foundation and relevancy. He asserts that there was no comparison of the condition of either B.H. or Alvarado before the pictures were taken and therefore they lacked foundation and were irrelevant. We determine that the record refutes this assertion.

B.H. testified that she did not have the bruises depicted in the exhibits prior to the morning of March 18, 2017; therefore, it was not necessary to have "before and after" pictures in order to make them relevant or to establish foundation. She explained where each of the bruises were located, when the photographs were taken, and that the bruises had not existed prior to the night of March 17.

Alvarado also takes issue with the fact that the examining nurse did not identify any of the injuries shown in the pictures. However, the pictures were taken on March 18 and 19, 2017. Testimony indicated that bruises typically take 1 to 2 days to appear. The examining nurse did identify red "finger marks" on B.H.'s hips and a small abrasion on her palm. Alvarado asserts that "there was testimony from the examining nurse that the alleged victim fell down the steep stairs leading to [Alvarado's] second-floor apartment." Brief for appellant at 16. However, no citation to the record is provided and our review of the bill of exceptions contains only the following statement from the examining nurse regarding a fall: "She had a small abrasion, I believe it was on her left palm. And she said she thought she remembered falling."

Regarding the photographs of Alvarado, those pictures depicted numerous scratches and red marks on his upper body, neck, and face. The investigating officer who took the photographs explained that the purpose of taking photographs is to document the condition of a person when he is brought in to

show either injuries or lack thereof. He established the proper foundation that the photographs depicted Alvarado's physical condition at the time he was brought into the police station. And those pictures were relevant to establish Alvarado's physical condition upon arrest. While no one testified that the injuries were inflicted by B.H., one of the investigating officers testified that they were "consistent with fingernail markings." Because the proper foundation was laid and the photographs were relevant, counsel was not ineffective for failing to object to them.

### (c) *United States v. Cronic*

Relying upon *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), Alvarado argues that because trial counsel made only eight objections during the 4-day trial, and none of those were directed to the admissibility of an exhibit, trial counsel was ineffective.

[8,9] *United States v. Cronic, supra*, stands for the principle that the Sixth Amendment guarantees a right not just to counsel, but to effective assistance of counsel. The Court explained "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic*, 406 U.S. at 659. But the Court also held that because the surrounding circumstances did not make it unlikely that the defendant could have received effective assistance, he could "make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel." *Id.*, 466 U.S. at 666.

The Nebraska Supreme Court addressed *United States v. Cronic, supra*, in *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017). It noted that *Cronic* provides narrow exceptions to the analysis in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2062, 80 L. Ed. 2d 674 (1984), where prejudice will be presumed, identifying those circumstances "'(1) where the accused is completely denied counsel at a critical stage of the

proceedings, (2) where counsel [entirely] fails to subject the prosecution's case to meaningful adversarial testing, and (3) where the surrounding circumstances may justify the presumption of ineffectiveness without inquiry into counsel's actual performance at trial.'" *State v. Jedlicka*, 297 Neb. at 294-95, 900 N.W.2d at 469.

Here, while it is true that trial counsel did not object to any exhibits offered, we have addressed the specific errors argued by appellate counsel as they relate to his failure to object and have concluded either that counsel was not ineffective for failing to object or that the record is insufficient to make a determination of his performance. And we note that trial counsel did make objections and presented a closing argument calling into question the State's proof. Counsel recognized, "We entered into a lot of stipulations that are in evidence, because those things are not in dispute. And some things in cross-examination I didn't contest because we agree." Counsel instead chose to focus on whether B.H. knew she was having sex and whether Alvarado knew that she was incapable of consenting, if in fact, she was incapable.

Because counsel did not entirely fail to subject the prosecution's case to meaningful adversarial testing, the record refutes the assertion that counsel was ineffective under *United States v. Cronic, supra*, for having made only eight objections at trial.

(d) Evidence of Plan B Medication

When Alvarado's apartment was searched on March 18, 2017, investigators found a "Plan B" medication instruction sheet and a pair of pants with a "Plan B" pill in the pocket. A search of his vehicle also revealed two pharmacy receipts, dated March 16, 2017, and March 18, 2017, for Plan B pills and a plastic bag containing Plan B packaging. This testimony, and photographs of the evidence, were admitted without objection. Plan B was described as a medication for women to take following unprotected intercourse. Alvarado claims that "trial

counsel was ineffective by not objecting and/or challenging the 'Plan B' pill evidence since urine testing revealed only the presence of marijuana, lidocaine, and flecainide in the alleged victim." Brief for appellant at 19. Consequently, he claims the evidence was irrelevant.

The State's theory, as explained in closing arguments, was that Alvarado kept Plan B medication on hand so he would be prepared for opportunities such as the one with B.H. It used the evidence as circumstantial evidence that B.H. and Alvarado had intercourse. To this extent, the evidence was relevant. The absence of the medication in B.H.'s urine does not controvert the State's theory; it simply indicates that B.H. may not have ingested one of the pills, if, in fact, her urine was tested for this drug. We note that the forensic scientist responsible for the testing of B.H.'s urine sample testified that there are seven categories of drugs that she screens for including amphetamine, methamphetamine, cannabinoids, barbiturates, benzodiazepines, cocaine metabolite, opiates, and methadone. The record is not clear whether Plan B medication would have registered in the samples.

Alvarado also claims that counsel should have objected to this evidence or filed a motion in limine because it was inflammatory and prejudicial. Whether the decision not to object to this testimony was trial strategy cannot be determined from the record, and we therefore conclude that the record is insufficient to address this argument.

### (e) Instructing Not to Testify

[10] Alvarado asserts he was advised by his trial counsel not to testify. Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable. *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011). Although the record affirmatively shows that Alvarado stated on the

record that he was choosing not to testify, the record does not contain the substance of counsel's advice and whether that advice was reasonable. Therefore, the record is insufficient to address this assigned error.

### (f) Evidence of Lidocaine

Alvarado asserts that counsel was ineffective for failing to object or file a motion in limine regarding the presence of lidocaine in B.H.'s urine, because there was no evidence Alvarado had the drug in his apartment or vehicle. As a result, Alvarado claims the evidence was speculative.

The gynecologist who testified explained that lidocaine is a numbing-type medication sometimes given to people who have herpes to decrease the pain. The State's theory was that Alvarado was infected with herpes, that Alvarado was using lidocaine for the pain, and that it entered B.H.'s system through intimate contact. Alvarado claims that a plausible explanation was that B.H. "suffered from herpes and used the lidocaine as treatment for her condition. The record is absent facts and evidence to rebut this plausible conclusion." Brief for appellant at 22. However, B.H. testified that she was not using any form of lidocaine on March 17, 2017, and that she did not have herpes before her encounter with Alvarado.

Given the other admissible testimony regarding herpes, this testimony was circumstantial evidence supporting the State's theory that B.H. and Alvarado engaged in intercourse, and given the other testimony regarding herpes, it was not so prejudicial and inflammatory that an objection would have been sustained. Counsel is not ineffective for failing to make a meritless objection. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). Therefore, we reject this claim.

### VI. CONCLUSION

Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to support Alvarado's conviction of first degree sexual assault

and find no abuse of discretion in the sentence imposed. We determine that the record is insufficient to determine whether counsel was ineffective in advising Alvarado not to testify or in failing to object to evidence regarding the Plan B medication. We therefore affirm the conviction and sentence.

Affirmed.