IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CHILDS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MOSES CHILDS, JR., APPELLANT.

Filed December 17, 2019.    No. A-18-1208.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Joe Nigro, Lancaster County Public Defender, and Shawn Elliott for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Moses Childs, Jr., appeals his plea-based conviction and sentence in the Lancaster County District Court for attempted first degree sexual assault. He claims that the trial court imposed an excessive sentence and that his trial counsel provided ineffective assistance. Based on the reasons that follow, we affirm Childs' conviction and sentence.

## II. BACKGROUND

In November 2017, Childs was charged with one count of first degree sexual assault. Childs subsequently entered a plea in abatement, arguing that there was insufficient evidence produced at his preliminary hearing to support a finding of probable cause that he committed the crime of first degree sexual assault. After the plea in abatement was overruled, a plea agreement was entered whereby Childs pled no contest to the reduced charge of attempted first degree sexual assault. Based on the plea, the State also agreed not to pursue a habitual criminal enhancement.

- 1 -

At the plea hearing, the State provided the following factual basis for the charge:

[E]mployees of Hooligans Bar, which is located . . . in Lincoln, Lancaster County, Nebraska, arrived to work in the mid-morning hours of August 30, 2017, to find that closing duties had not been completed from the closing shift for the previous night and the office to be in disarray. Surveillance footage was then reviewed, and it showed the victim, who has the initials J.R., in an extreme intoxicated state in the bar area. Thereafter, it showed [Childs], who was also observed in the video, to escort her into the office and engage in sexual activity.

The suspect in the video was identified as the defendant, Mr. Moses Childs. He had worked security for Hooligans as an employee for Lockdown Security. He was contacted and interviewed, and he readily admitted that he had had sexual contact with the victim the previous evening. He indicated that the entire incident was consensual. He mentioned that on the night of the assault, that the victim was the most intoxicated that he has ever seen her but maintained that he felt that she was in a position where she was able to consent. At one point the officer confronted him over the fact that he had viewed the video and that she appeared to be passed out. And his response was this is how she always acted when she was enjoying sex.

[Childs] made mention during the interview that there was a text conversation between the two of them in the afternoon prior to him going to the bar where it was obvious that there was a plan for them to have sex. He was unable to show the officers these texts, and he claimed that he had dropped his phone out of his car and ran it over. He was able to provide a black LG Spree cell phone from his vehicle with a cracked screen and provided consent for law enforcement to do a download of that particular phone.

Officers made contact with the victim, and she showed text messages between her and [Childs] which occurred in the afternoon previous to the assault. She had a long paragraph text basically accusing [Childs] of being a, quote, unquote, "player" and her not wanting to have sex with him. Specifically, she told him, quote, "And plus I told you I don't want to fuck you if you're fucking a million other girls. LOL. I told you that," end quote. This also was found on [Childs'] phone when it was examined pursuant to his consent. She further reported that she was outside of Hooligans smoking when [Childs] arrived. She thought that was between 8:30 to 9:00 in the evening hours of August 29th of 2017.

There was a little bit of conversation between them. And at one point [Childs] again said one time that they were going to have sex that night. And she said she laughed about it and told him it was not going to happen. She maintained that there was never any positive affirmation towards [Childs] about any sexual contact and that any reasonable person would have read any of their text messages or contact as not being consent for any type of sexual conduct.

She reported smoking some marijuana earlier in the day prior to going to work but had no alcohol or any other type of drugs besides the marijuana. She reported that while at work she remembers having an energy drink when she first got there and some water. Towards the end of the evening, she states she remembers having three what she described

as Jagerbombs. She described those as mixed drinks with Jagermeister and Red Bull. She stated there was about an ounce shot in each one of those drinks. So, in essence, she had about two standard-sized shots or about three ounces of alcohol; that being, in this case, Jagermeister.

The video was pulled and examined by law enforcement. Upon examination by law enforcement, they were able to confirm that the victim had approximately, actually, six Jagerbombs, which is Jagermeister and Red Bull. The last couple or three seemed like they had kind of long pours to almost a six count that she's pouring into a plastic cup. So the officers stated that it would be well over a standard one-half-ounce to two-ounce shot.

She's visibly stumbling and staggering as she was walking. The blood alcohol test revealed that she had a .134 from blood drawn during the SANE exam in the late morning hours of August 30, 2017. Also observed in the video, she's seated at the front of the bar where she appears to be passing out. She's physically holding herself up trying to keep from falling to the ground. This would be at approximately 2 a.m. of August 30, 2017. She staggers behind the bar. [Childs] follows and basically pulls her out from behind the bar and assists her as they are walking towards the office. She staggers and collapses her front half onto a pool table. [Childs] comes over, holds her by her right arm, and escorts her away toward the office.

In the office she's observed kind of stumbling and staggering. And upon entering the office, she sits down in a chair on wheels and slouches in there almost lying supine on the chair with her arms hanging down her side and her legs sprawled out apart. She is pulled up and stands up in a position where [Childs] needs to maintain a hold of her so she doesn't fall over. At one point she falls back into the desk, ricochets off into some boxes on the side. Throughout the course of this event, he -- he being [Childs] -- eventually pulls her back toward him and basically lays her supine on the floor.

At this point it appears that she is completely unconscious. There's no movement in her extremities -- arms, legs. She is completely sprawled out. Her eyes do appear to be closed. He is at one point tapping her on the left cheek and moving her head. Her head completely falls off to the left side. He manipulates her by lifting both her legs up to where her knees are bent. Her right leg is up on his shoulder. He places her left foot up on his shoulder. It appears that he then begins to vaginally penetrate her with his penis.

At one point he pulls up the left arm of the victim and pulls it towards him, and the arm just falls back limp. Through this it appears that there is no muscle resistance in her legs. Her thighs are casual. He's doing this, and at this point her head is cocked off to the left side where it's just slouched there. Every once in a while her head will move back towards an upward position, and then it just relaxes back down to the left side.

Later he is actually seen shaking her on the right shoulder as if he was trying to see if she will respond. He stands up, basically pulls her up where it's obvious that she is complete dead weight. He physically picks her up underneath her underarms. The way that he is grasping her, this would probably be how she got the bruising on her biceps that she had showed during an interview. He is then able to lift her up to her feet. She is able to gather her feet underneath her, but by no means can she maintain any balance at all.

He picks up his sweatshirt after the assault off the floor. He's grabbing both of her arms. He kind of pulls her to a standing position. She is unable to stand on her own and twirls around him and falls between his legs. He then grabs her from underneath of her arms in the armpit area and kind of pulls her up. They are facing face-to-face, and he walks her back towards the office chair where he puts her down to take a seat in the office chair. Once she does sit in the office chair, her feet are again sprawled out. And while she is in that position, he appears to attempt to place her clothes back on her. He then gets her clothes back on her. He puts her back into the office chair. He grabs a plastic chair and places her feet up on the plastic chair. He takes his hat, and at that time he leaves the area.

At this point when he leaves, the victim remains behind in the office on her own and appears to be passed out in that position. She does not -- and this is at approximately 2:30 in the morning. She eventually is seen to wake up at approximately 8:10 a.m. When questioned about this, she has no recollection of these events. She did have several minor abrasions on her face and chin and bruising on her arms and legs, which are consistent with the activities that were observed on the video. All of these acts occurred in Lancaster County, Nebraska.

At the plea hearing, the trial court informed Childs of the rights he would be giving up if his plea was accepted and the possible sentence that could be imposed. The trial court found beyond a reasonable doubt that Childs understood the nature of the charge against him and the possible sentence that could be imposed; that his plea was made freely, intelligently, voluntarily, and understandingly; and that there was a factual basis to support the plea of no contest. The trial court found Childs guilty of one count of attempted first degree sexual assault and ordered a presentence investigation.

A sentencing hearing took place on November 29, 2018, and the court sentenced Childs to 19 years 10 months to 20 years in prison. The court gave Childs 448 days' credit for time served.

## III. ASSIGNMENTS OF ERROR

Childs assigns that the trial court erred by imposing an excessive sentence, and he separately assigns as error nine claims of ineffective assistance of trial counsel. Childs argues that his right to effective assistance of counsel under the U.S. and Nebraska constitutions was denied when his trial counsel (1) failed to interview the alleged victim prior to the plea hearing; (2) failed to present evidence that would have proven the nature, duration, and type of relationship he had with the alleged victim; (3) failed to advise him to have a trial as opposed to accepting a plea offer; (4) offered him an improper inducement by waiving remaining attorney fees if he accepted the State's plea offer; (5) failed to honor the agreement that Stephen P. Kraft would be his attorney; (6) failed to prepare a defense leaving him with no other choice but to accept the State's plea offer; (7) failed to communicate with him during the sentencing phase of the proceeding; (8) refused to perfect an appeal for him; and (9) failed to file a motion to discharge when his right to a speedy trial had been denied.

## IV. STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving the litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. EXCESSIVE SENTENCE

Childs first argues that the trial court imposed an excessive sentence. We find that the trial court did not abuse its discretion in sentencing Childs.

Under Neb. Rev. Stat. § 28-319(2) (Reissue 2016), first degree sexual assault is classified as a Class II felony. Under Neb. Rev. Stat. § 28-201(4)(B) (Reissue 2016), criminal attempt of a Class II felony is classified as a Class IIA felony. A Class IIA felony, under Neb. Rev. Stat. § 28-105(1) (Reissue 2016), is punishable by a maximum of 20 years' imprisonment, with no statutory minimum. The trial court sentenced Childs to 19 years 10 months to 20 years in prison.

Childs' sentence, although essentially the maximum sentence permitted, is within the statutory limits. Nevertheless, Childs argues that the trial court abused its discretion in six ways:

> First, the court entirely discounted the prior consensual sexual relationship that existed between J.R. and [Childs]. Second, the court failed to acknowledge that the video did depict J.R. performing oral sex on [Childs] in two different positions. Third, the court failed to recognize that during the sexual encounter, although the video depicts her to be clearly intoxicated, she was not always in an unconscious state.

> Fourth, the court failed to consider [Childs] himself had been drinking and that the sexual encounter took place in a darkened room. Fifth, the court gave [Childs] no credit for having entered a plea which saved J.R. from having to testify about what had occurred and saved the State from the expense and time of trial. Finally, the court's abuse of discretion is further demonstrated by the court not considering that [Childs] would receive an additional federal sentence based on this offense which also constituted a violation of his supervised release.

Brief for appellant at 25-26.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the

sentence to be imposed. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

The trial court, at sentencing, indicated that it had reviewed and considered the entirety of the presentence investigation report, video of the incident, and over ten hours of video surveillance from the location of the crime. The trial court also provided Childs the opportunity to address the court himself. After hearing from the State and counsel for Childs, the court went on to sentence Childs, noting:

This is a case unlike any other that I've ever seen, and I was a prosecutor for over 11 years prosecuting these kinds of cases as well. It is very rare that we are able to obtain an actual video of a crime occurring as it is happening. I would say almost never in a crime of a sexual assault. Crimes of this nature are left to the description of the victim, which in cases where the person is incapacitated is foggy, at best, if any description whatsoever.

In this particular case, the owners of this particular establishment, when investigating why the closing procedures had not been conducted the night before, took a look at their video surveillance. And they were so appalled that they didn't call their employee. They didn't call you, Mr. Childs. They immediately called the police.

I don't know that I have a word for what I viewed on that video other than it was horrifying. If you think in any way that this victim participated willingly at any stage of this encounter, then you have something seriously wrong with your thought process.

In addition, the suggestion that someone has been locked up or institutionalized so long that they have not been exposed to the evolving respect for women in this country is horrible. What I viewed on that videotape would not have been okay 30 years ago, 20 years ago, 10 years ago, or today.

That woman was a rag doll, a rag doll. She was completely unconscious. I don't care if she had sex with you willingly for a hundred years before that night. What you did to her was a crime.

You received a generous plea offer, not something that I had anything to do with. And I take all of that into consideration.

There is no way -- I can't even envision a circumstance of facts that, after a jury would have seen that video, they would have done anything other than convict you.

And not only did I watch the over 30 minutes of you assaulting this unconscious woman, but I also watched over 10 hours of surveillance videotape of this bar. And any indication that she in any way asked for anything that happened to her is a joke. It's offensive.

Having regard for the nature and circumstances of this crime, the history, character, and condition of [Childs], the Court finds that imprisonment of [Childs] is necessary for

the protection of the public because the risk is substantial that during any period of probation [Childs] would engage in additional criminal conduct and because a lesser sentence would depreciate the seriousness of [Childs'] crime and promote disrespect for the law.

The court went on to sentence Childs to 19 years 10 months' to 20 years' imprisonment, with the sentence running consecutive to any other sentence Childs was serving. We note that although this sentence is essentially the maximum sentence permitted by law, Childs has a history of criminal behavior, was determined to be a "very high risk" to reoffend under the Level of Service/Case Management Inventory (LS/CMI), an assessment tool "designed specifically to determine the degree of risk that the offender presents to the community and risk to recidivate," and "high risk" under the Vermont Assessment for Sex Offender Risk. We also note that Childs continues to avoid taking any responsibility for his actions, instead shifting the focus on the fact that he should not have sex with other women while married, rather than acknowledging the impact his actions had on the victim and apologizing to her directly.

The record reflects that the trial court reviewed the presentence investigation report and considered the appropriate factors in reaching its conclusion. There is no indication that the trial court took into consideration any inappropriate factors in reaching its sentencing determination. Therefore, the sentence imposed by the trial court does not constitute an abuse of discretion.

### 2. INEFFECTIVE ASSISTANCE OF COUNSEL

Childs also asserts a number of claims alleging that he received ineffective assistance of trial counsel. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. *State v. Sinkey*, 303 Neb. 345, 929 N.W.2d 35 (2019).

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id*. In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id*. When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id*.

While the Nebraska Supreme Court has held that an appellant need not allege prejudice on direct appeal when claiming ineffective assistance of trial counsel, the Supreme Court does require "specific allegations of the *conduct* that he or she claims constitutes deficient performance[.]" *State v. Filholm*, 287 Neb. 763, 770, 848 N.W.2d 571, 578 (2014) (emphasis supplied). In order to avoid

a procedural bar to a future postconviction proceeding, a claim of ineffective assistance of counsel must be presented with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Sinkey*, *supra*. Against that background, we will address each of Childs' allegations of ineffective assistance of trial counsel in turn.

### (a) Failure to Interview Victim

Childs first argues that he was denied effective assistance of counsel when his trial counsel failed to interview the alleged victim prior to the plea hearing. We first note that this allegation meets the standard of specificity we require for claims of ineffective assistance of counsel on direct appeal.

Here, we find that the record before this court is insufficient to determine the matter. While Childs makes a number of factual allegations about trial counsel's failure to interview, depose, or subpoena the victim in order to support his belief that she "feigned a lack of recollection of having engaged in consensual sex with him on the night of the offense[,]" we agree with Childs that the trial court was not afforded the opportunity to develop the extent and content of discussions between Childs and his attorney, or the reasons trial counsel did not pursue an interview or testimony from the alleged victim. Brief for appellant at 29. This matter cannot be determined upon the trial record before us.

### (b) Failure to Present Evidence of Relationship With Victim

Childs next contends that his trial counsel was ineffective by failing to present evidence that would have proven the nature, duration, and type of relationship he had with the alleged victim. In particular, Childs argues that had this evidence been introduced, he would have been able to prove that the victim consented to sexual intercourse on the night of the incident. He also argues that "trial counsel should have obtained all of [his] phone records which would have established a pattern of both having discussed [his and J.R.'s] sexual relationship and willingness to be in such a consensual relationship." Brief for appellant at 31.

We find that trial counsel was not deficient for failing to develop such evidence for trial. Because the evidence was not relevant, any effort to present such would have been fruitless. Defense counsel is not ineffective for failing to raise an argument that has no merit. *State v. Martinez*, 302 Neb. 526, 924 N.W.2d 295 (2019).

Certain evidence is admissible in a criminal case, if otherwise admissible under the Nebraska Evidence Rules, under Neb. Rev. Stat. § 27-412(2)(a) (Reissue 2016):

> (ii) Evidence of specific instances of sexual behavior of the victim with respect to the accused offered by the accused to prove consent of the victim if it is first established to the court that such behavior is similar to the behavior involved in the case and tends to establish a pattern of behavior of the victim relevant to the issue of consent; and

> (iii) Evidence, the exclusion of which would violate the constitutional rights of the accused.

For evidence to be admissible under § 27-412(2)(a)(ii), Childs must first show that the specific instances of the victim's sexual behavior he wishes to admit as evidence are "similar to the behavior involved in the case and tends to establish a pattern of behavior of the victim relevant to the issue of consent[.]" Childs admitted during his interview with law enforcement that the victim was intoxicated and that he had "never seen her like that" and "never had to carry her." He also admitted he and J.R. had never had sex in the bar before.

Furthermore, Childs' phone records, even if such establish a history of consensual sexual relations between Childs and J.R., are not relevant to the issue of whether the victim consented to sex on this particular occasion. This court has made clear that the rationale for the protections of Nebraska's rape shield statute, § 27-412(2)(a), is "to protect people from being 'assaulted' in the courtroom by their sexual history" and that "consent to sex with one person is not consent to sex with all people, nor is consent on one occasion consent for all occasions." *State v. McSwine*, 24 Neb. App. 453, 461, 890 N.W.2d 518, 526 (2017) (quoting *State v. Johnson*, 9 Neb. App. 140, 609 N.W.2d 48 (2000)). Because Childs cannot show that any prior sexual relationship he had with J.R. "establish[es] a pattern of behavior of the victim relevant to the issue of consent" trial counsel's failure to introduce such evidence was not deficient. This argument fails.

(c) Failure to Advise Childs to Go to Trial

Next, Childs argues that trial counsel was ineffective by failing to advise him to have a trial as opposed to accepting a plea offer. We find that this argument can be determined on the record before us, and fails.

We find the facts of this case similar to those presented to this court in *State v. Robeson*, 25 Neb. App. 138, 154, 903 N.W.2d 677, 689-90 (2017), where we held:

> Although our record does not contain [the defendant's] conversations with trial counsel prior to the entry of his guilty plea, the record does affirmatively refute his claim of ineffective assistance of counsel because it demonstrates that his plea was entered knowingly, understandingly, intelligently, and voluntarily, and it establishes the benefit [the defendant] received by entering this plea. Given our reading of the record, we conclude that [the defendant] cannot demonstrate that he was prejudiced by any advice counsel gave him regarding accepting the terms of the plea agreement.

In this case, Childs was questioned at length about his understanding of the consequences of entering a plea, the rights he would be giving up, and the possible penalties that could be imposed. The record clearly demonstrates that Childs entered his plea knowingly, understandingly, intelligently, and voluntarily. Childs also received the benefit of the reduced charge of attempted first degree sexual assault, with a maximum penalty of 20 years' imprisonment, versus the original charge of first degree sexual assault, with a penalty of 1 to 50 years' imprisonment. The State also agreed not to pursue a penalty under the habitual criminal statute. Based on Childs' voluntary plea, and the benefit he received from the plea agreement, we conclude that Childs cannot demonstrate that he was prejudiced by any advice trial counsel gave him regarding accepting the State's plea offer. This claim of ineffective assistance of trial counsel therefore fails.

### (d) Improper Inducement to Accept State's Plea Offer

Childs next claims that he was denied effective assistance of counsel when his trial counsel offered him an inducement by waiving remaining attorney fees if he accepted the State's plea offer. However, the record affirmatively refutes this claim. At the plea hearing, the trial court asked Childs: "Other than this plea agreement, has anyone connected with law enforcement, or anyone else, made any threat, direct or indirect, used any force, or held out any promise of any kind to get you to come in here today, enter this plea, and waive your rights?" Childs responded "No, ma'am" to the court, admitting that his trial counsel had not made any improper inducement to enter the plea. This argument fails.

### (e) Failure to Honor Agreement Regarding Representation

Next, Childs argues he was denied the right to effective assistance of counsel insomuch as trial counsel, Nicholas R. Glasz, failed to honor an agreement that Kraft would be his attorney and Glasz would serve only in a secondary role. We conclude that Childs cannot establish prejudice from having Glasz represent him in a primary capacity in various proceedings throughout the case. Childs claims that "[p]rejudice is established because [he] did not have the guidance of his hired counsel, Mr. Kraft, who had the requisite experience to provide him with competent legal advice at such a critical stage." Brief for appellant at 37. Childs refers to the moment he had to decide whether or not to accept the State's plea offer as this "critical stage." *Id.* However, as we previously stated, the record affirmatively establishes that Childs entered into the plea knowingly, understandingly, intelligently, and voluntarily. Childs was specifically asked whether he had adequate time to consult with Glasz regarding any possible defenses that may have been available had he pursued a trial. When directly asked if he was satisfied with the job Glasz had done as his attorney, Childs responded that he was and that he felt Glasz was a competent attorney and knew what he was doing throughout the proceedings. We conclude that the record affirmatively refutes this claim and Childs' argument fails.

### (f) Failure to Prepare Adequate Defense

Childs next contends that he was denied effective assistance of counsel in that his trial counsel's failure to prepare a defense left him with no other choice but to accept the State's plea offer. Childs argues that trial counsel was deficient in many of the same respects addressed in his previous assignments of error. To the extent we have already addressed these particular allegations of ineffective assistance, we adhere to these holdings. However, both Childs, and the State, agree that the record, as it pertains to communications between Childs and his attorneys regarding the preparation of a defense, is insufficient to resolve this claim on direct appeal. We agree.

### (g) Failure to Communicate During Sentencing

Next, Childs argues that trial counsel failed to communicate with him during the sentencing phase of the proceeding. In particular, Childs contends that certain arguments Kraft made in closing were met with disdain by the trial court, and he was punished more harshly as a result. In particular, Childs takes issue with Kraft's comments that Childs was unable to understand the evolving social mores as they relate to whether sexual relations are consensual or not due to his 13

years of incarceration. However, based on the district court's sentencing comments, we find that Childs has not established prejudice.

At sentencing, the district judge noted she had reviewed the entirety of the surveillance footage from the incident and described it as "horrifying." The court noted the video made clear that the victim was "completely unconscious" and incapable of consent and took issue with Childs' mitigation arguments that he and the victim had an existing sexual relationship and that she had consented on this particular occasion. The court also considered the "generous" plea offer Childs was given. Finally, after reviewing the presentence investigation report, and considering "the nature and circumstances of this crime, the history, character, and condition of the defendant," the likelihood of recidivism, and the public interest, the court sentenced Childs to 19 years 10 months to 20 years in prison. Based on the reasons the district court provided in issuing Childs' sentence, we find that Childs has not established prejudice and this argument fails.

### (h) Refusal to Perfect Appeal

Childs next contends that he was denied effective assistance of counsel when trial counsel refused to perfect an appeal for him. However, we find that the very fact the instant direct appeal is before us is sufficient to show that Childs cannot show prejudice from the fact his trial counsel refused to file an appeal on his behalf. While Childs correctly cites *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000), for its premise that prejudice will be presumed when counsel fails to perfect an appeal after a criminal defendant directs such, Childs nevertheless successfully filed a pro se notice of appeal and motion for appointment of counsel, and is now represented by counsel on this appeal. We therefore find no prejudice from trial counsel's actions, regardless of whether or not they were deficient.

### (i) Failure to File Motion to Discharge

Childs' final assignment of error is that his trial counsel provided ineffective assistance when he failed to file a motion to discharge when Childs' right to a speedy trial had been denied, and did not advise him that he had a meritorious speedy trial claim. We conclude that because Childs did not have a viable speedy trial claim, trial counsel was not ineffective for failing to file a motion to discharge and this argument fails. Defense counsel is not ineffective for failing to raise an argument that has no merit. *State v. Martinez, supra*.

Under Neb. Rev. Stat. § 29-1207 (Reissue 2016), a criminal defendant has a statutory right to be brought to trial within six months of the day the charging document is filed. Under § 29-1207(4)(a), certain periods are excluded in computing the 6-month period. In addition, a criminal defendant has a constitutional right to a speedy trial under both the U.S. and Nebraska constitutions. U.S. Const. amend. VI; Neb. Const. art. I, § 11. The constitutional right to a speedy trial and the statutory implementation of that right exist independently of each other. *State v. Karch*, 263 Neb. 230, 639 N.W.2d 118 (2002).

While Childs makes a number of arguments suggesting his statutory right to a speedy trial was violated, we need only address one because it is dispositive of the issue. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017).

Childs contends that the trial court "did not properly advise him of his statutory right to a speedy trial due to the court having conflated the statutory right with the constitutional right." Brief for appellant at 47. We disagree. At an April 25, 2018, hearing, Childs opted to waive his right to speedy trial. Regarding his right to speedy trial, the trial court explained:

> That is a right that's guaranteed to you by both the United States and the Nebraska Constitution. In practical effect what that means is that you must be brought to trial within six months from the date that the charges were filed against you up here in District Court, unless you ask for that matter to be continued.

> If you do and the Court grants you that continuance, that time would not be counted against that six-month time period. Do you understand that?

Childs responded that he understood, and further acknowledged that he had spoken with his attorney regarding his right and had all of his questions answered. Now on appeal, Childs contends that this advisement was insufficient. However, under both the U.S. and Nebraska constitutions, there is no mention of the specific 6-month period for the right to a speedy trial. That time period is mentioned only within § 29-1207. Therefore, while the trial court did not specifically mention that the source of this right was statutory, the advisement was nevertheless adequate to inform Childs of his right for purposes of waiver. In further support that Childs knowingly, understandingly, intelligently, and voluntarily waived his right to speedy, Childs acknowledged that he had discussed the right with his attorney.

We find that Childs knowingly and voluntarily waived his right to a speedy trial at the April 25, 2018, hearing and that the 56-day period between the hearing and the continued docket call scheduled for June 20, 2018, is excludable under § 29-1207(4)(b) for purposes of the speedy trial calculation. Since Childs concedes two other time periods were excludable under § 29-1207(4)(a) and extended the speedy trial deadline to August 4, 2018, this 56-day period would extend the deadline to September 29, 2018. Childs entered his no contest plea on August 24, 2018, well within the applicable speedy trial deadline. We therefore need not address whether the other disputed time periods were excludable under § 29-1207(4)(b). Because Childs did not have a meritorious speedy trial claim, it was not in error for his trial counsel to fail to file a motion to discharge, and his ineffective assistance of counsel argument fails.

## VI. CONCLUSION

We conclude that the trial court did not err in sentencing Childs to 19 years 10 months' to 20 years' imprisonment. We also find that the record on appeal is insufficient to address several of Childs' allegations of ineffective assistance of counsel and that the remaining claims fail. Childs' conviction and sentence are affirmed.

AFFIRMED.

- 12 -